The next case this morning is 25-2099 La Frontera Center v. United Behavioral Health. Counsel, whenever you're ready, you can make your appearance, please. Good morning, and may it please the Court. My name is Bob Neal, appearing on behalf of La Frontera Center, along with my colleague, Richard Tegmayer. This matter considers a ketan action brought by La Frontera against United under the False Claims Act and its New Mexico State analog, the FATA. This appeal implicates United's submissions of false claims under a $1.6 billion contract negotiated and entered into in 2009 to serve as the processor of behavioral health claims throughout the state of New Mexico. And despite the quite litigious nature of the False Claims Act, many of the issues, if not all of the issues presented here in appeal, have not been considered by this circuit. And so the district court here resolved this case in two different manners. First, count one on the motion to dismiss phase via statute of limitations and the public disclosure bar, and then counts two, three, and five, which are on appeal at the summary judgment stage. And I actually want to start later in time with the summary judgment decision, particularly with the issue of scienter. And could I start with that too? Yes. And I want to start with it in this context. The argument that United makes, at least as I discerned it, was that if they were to prevail as it relates to count five on the summary judgment, that that in effect would nullify as well the challenge as it relates to count one by virtue of making it any sort of victory on count one harmless error. What is your view of that argument? Thank you, Chief Judge Holmes. We respectfully disagree with that argument. And I'm obliged to say that La Frontera placed material facts in genuine dispute, so it does not need to reach that argument. But if the court does reach that argument, there are material differences between the False Claims Act and the FATA that were not considered, and the standard was not applied to the Federal False Claims Act that it was under the FATA. And we think that there are distinguishing patterns between the two cases. Is the definition of scienter different under the two acts? My understanding is the definition of knowingly, if that is your question, Judge McHugh, that it is the same or substantially similar between the two acts. And La Frontera's position is specifically that there's evidence in this case that the state worked with United to a certain degree to collude and submit its false claims. And so as a result, the federal actor or the United States government might have a different damage position or might be damaged in a different way than the state actors. And so that factual distinction could mean that the United did not knowingly defraud the state, but it could have knowingly defrauded the U.S. federal government. Let me see if I'm understanding. I'm not quite understanding. You're saying that because they could be injured in different ways that it impacts whether the bad actor knew they were acting fraudulently. I think that the main point here is that the analysis could be different based on different factors and different facts for whether or not knowledge or scienter existed. And essentially, it's a measure of what the standard was applied. And La Frontera urges this court to not collapse these factual distinctions. Let me ask you this. If we concluded that there was not evidence from which a jury could find that United knowingly entered into the contract, knowing that it couldn't perform, wouldn't that invalidate both the FCA and FATA claims? Your Honor is requesting that La Frontera concede the point that these should be collapsed into one. I'm just saying if we were to find, look, we'd conclude that here, that given what was put before the court on summary judgment, a reasonable jury could not find that there was a knowing deception at the time the contract was entered. You know, a breach of contract isn't fraud, right? And if we were to say you can't get to fraud, you can get to breach, I don't understand why that wouldn't be detrimental or would make both claims fail. I think that there is a reasonable interpretation that it would make both claims fail. It's just not a position that La Frontera is willing to take. Tell me why it doesn't. If you assume what I just said, that we, a reasonable jury could not find there was fraudulent inducement, you know, that they didn't enter into the contract with the intent not to perform, how could either of these claims survive? The idea would be, and I don't want to be a stick in the mud, but the idea would be that the facts differ for purposes of analyzing the FATA and the FCA. And so that there could be a fraudulent inducement of the federal government, but because there was collusion between the state and United, there would not be fraudulent inducement based on the facts that were analyzed by the district court, because it only analyzed the FATA and not the FCA. So what are the different facts? The different facts specifically would point the court to the development of specific amendments at the end of the contract term in which United was attempting to seek additional damages for, excuse me, additional funds out of the contract by producing this fraudulent or a series of fraudulent claims that 90% of New Mexico providers were committing fraud. That is one way in which there was or potentially was collusion between the state and United. So those don't go to fraudulent inducement, though, do they? No, they don't go to fraudulent inducement. Okay, so we have to go back. Are there facts? I mean, there's a question, I guess, of whether you pled a fraud claim other than fraud in the inducement, and we can argue about that later. Sure. But I guess I'm just having a hard time understanding what the facts would be that would make the federal claim different if we're focused on fraud in the inducement. Yes. So what did they do different to induce the feds than they did with the state? I mean, the main facts here is that they were coordinating directly with the state in order to create the contract. And that's not surprising, is it? Because the state is who administrates all this. That's correct, yes. And so the federal government had a different position throughout the entire process than the state government did. The state government was involved from the very beginning in coordinating and generating what ultimately became the contract. And the United States government was not involved from the very beginning. And that might create, and we're suggesting that might create a difference, a factual difference that would distinguish the ability to fraudulently induce from the beginning, in addition, through all the way. So, you know, our example from the end of the contract is just illustrative of that continued close relationship that started at the very beginning of the contract. Okay. Other than working with the party that was charged, that was working, the state and the feds work cooperatively with this stuff. The feds give them the money, and the state handles the program, right? That's correct. Well, the federal government is involved here because Medicaid is involved. Right. Yes. But they're involved from a money standpoint. They give the Medicaid money to the state. The state handles the contracting and the administration of the program. That's correct. Okay. What did the feds do? What was the federal involvement where United would have been inducing them to do anything? And I think that that is, it's all part and parcel of the same piece, is that by providing, you know, funds and committing funds via the Medicaid program, the False Claims Act has acknowledged that you can submit claims or create or fraudulently induce a contract in which the federal government is supplying the funds for the contract. And so that is the way that the federal government has evolved, and it still can be fraudulently induced because it is providing the funds itself. Fair enough. But the contract that has to be fraudulently induced is the one with the state. That is correct. The federal government never showed up with a thousand-page document and said, United, we want you to enter into this contract with us. That is correct as well.  Thanks. And I would like to move to the substance of the Scienter argument briefly, and that is I do want to point out the two main errors that the district court made. The first is one that affects both the motion to dismiss statute of limitations argument as well as the Scienter argument, and that is that the district court erroneously held that the only relevant point in time for purposes of analyzing the issue of fraudulent inducement was the execution or entering into that contract itself. La Frontera argues that as established by the Supreme Court in Hess, the 1943 case, and its progeny that have been adopted across the circuits, those cases have indicated that there are false claims that can arise out of a fraudulently induced contract, and those are legally cognizable claims and separate false claims. And that can include things like payment. It can include, for instance, in this circumstance, falsely adjudicated claims or retention of overpayments. And that is important for the process or the analysis of Scienter because the district court refused to consider any post-contractual evidence or circumstantial evidence in order to analyze whether there was Scienter. And circuits across the country have determined that such circumstantial evidence is not only important for the analysis of fraud and false claims and whether they were submitted, but is actually necessary. Let me understand you. It would seem that even if there was error in not accepting the fact that there could be other, the focus could encompass claims that were submitted under a fraudulently induced contract. Even if that was error, you still have to show that there was a fraudulently induced contract, right? Yes. You still need to show that there was Scienter, that there was knowing, they knowingly made misrepresentations that got the state of New Mexico to enter into the contract. And are you arguing that evidence that some of the subsequent claims for payment were fraudulent could retrospectively have a bearing on whether there was fraud in the inducement to enter the contract to begin with? I think our argument is slightly different than that. The argument is that we, La Frontera, put forth several pieces of evidence that occurred post-contractually from which the district court erred in not inferring on the summary judgment standard that that could have been or that United never had the knowledge, the capacity, or the technology that it claimed it did. But would, I'm sorry, would that mean that the, is that just saying that the other claims were fraudulent, that the district court ignored the fact that the other claims were fraudulent? Or again, I'm trying to make sure whether, are you trying to say that if there was evidence that there was some, that there was fraud related to these other claims or other post-conduct, not, you know, frame it any way you want, post-contractual conduct, are you saying that that conduct has any bearing on the actual acts that took place prior to that in terms of the inducement of the contract? No, I don't. I think that that's a separate argument. That there are cognizable false claims that are separate but grounded in the fraudulent inducement is separate from our evidentiary argument that we did provide evidence that, from which an inference can be drawn regarding whether the contract was fraudulently induced. Well, then if you lose on the fraudulent inducement piece, you're done, right? I mean, it all stems from that. The case does stem from fraudulent inducement, yes. And I'd like to reserve what little time I have left for rebuttal. Chief, can I ask you one question real fast? I want to ask you a question about the public disclosure. On the public disclosure issue, does the public disclosure have to show fraud on the face of the public disclosure, or does it have to show information which would make the government go investigate? It is more the latter. In my understanding, I think that Chief Judge Holmes' authored opinion read the key point, which does go into this discussion, and it's not that there needs to be fraud on the face, but there does need to be some connection between the fraud and the disclosed facts, and some evidence, some analysis of that connection. And what we have here is the district court admitting openly that the information it relied upon was not fraud, but then also not analyzing the second piece, that there was a connection to it either. Okay. Okay. Thank you, Counsel. We'll give you a minute when you come back. I appreciate that. Thank you. Good morning, Your Honors, and may it please the Court. Jessica Ellsworth on behalf of the appellees. The district court's judgment in this case should be affirmed. Optum provided government-funded behavioral health services under a contract from 2009 until 2013 with the State of New Mexico. The district court correctly granted summary judgment for two basic reasons. First, there is no evidence that the RFP response that Optum or United, they're the same entity, submitted knowingly misrepresented whether United would or could perform if it was awarded the contract. La Frontera's allegations of fraudulent inducement conflict with the evidence in this case. Everyone from Optum's employees to New Mexico officials to La Frontera's own CEO testified that Optum or United's RFP response accurately conveyed its subjectively held view that it was capable of building this claims processing system that New Mexico wanted and that it intended to do so if it was awarded the contract. Well, that's arguably self-serving, though. Why shouldn't the court have also considered what actually happened? I mean, Optum and the state and everybody can get up and say, oh, well, they really thought they could do it. But then when you look at the very poor execution of the project later, couldn't the very fact that the start and the execution of the project was so bad that no reasonable executive could have believed that they were capable of handling this project? So, Judge Carson, I think there are two pieces to answering your question. And the first is a point that Judge McHugh made, which is that breach of contract and fraudulent inducement are different. I agree with that. And Scienter plays a very significant role in kind of policing the line between the two. No, but I guess my question is, couldn't the performance be so bad that it would be indicative of somebody's state of mind when they entered the contract that they wanted the money, but they knew they couldn't do it? So, Your Honor, I don't think this court needs to take a bright-line rule on whether it ever could be. I think there's good reason to doubt that it could be. And that's because the shoot case from the Supreme Court that really focuses on the subjectively held belief at the time the conduct occurred, it's difficult for me to see what would have to come up later that would satisfy that. But in any event, what came up here were very clearly implementation issues that providers raised, that some Optum employees raised. And I think the court should look at what those complaints are. Did they say at the time that they entered into the contract that they had a fraud detection technology or system and a claims processing system? Oh, they did, Your Honor. And did they? And they absolutely provided examples from many different states of all of the work that they had done with states and localities to set up this kind of system, to run this kind of system, to have fraud and abuse detection available within the system 100 percent. And if it colossally fails once they enter the contract, why can't one infer that you really weren't being truthful in saying that you could do it? Because, I mean, they weren't supposed to be making representations in the vacuum. They were supposed to be saying, we can do it for you, right? That's right, Your Honor. The context of a colossal failure is a far cry from the facts in this case. The failures that are alleged in this case, and you should look at these e-mails. There are things like, IT didn't configure my phone on the right day. Someone showed up for work late one day. Two people took the same day off of work. None of that is indicative of a colossal failure. In fact, we know- Well, it was enough to have them penalized with a fairly serious monetary penalty, wasn't it? So, Your Honor, there was certainly issues that came up from providers. This was a new system that New Mexico was putting in place, where instead of being paid in advance of providing treatment, providers had to justify, after the fact, every patient encounter in order to receive payment. It was really a new system that was going to be used. And providers certainly struggled- Well, what I'm pushing you on is your idea that there wasn't a colossal failure here when you have a $1.2 million sanction and an order for a corrective action plan. I mean, I don't think this is about configuring somebody's cell phone, and I don't think that fairly represents the record here. So, Your Honor, I think if you do want to see what fairly represents the record, you can look at Volume 11 of the Joint Appendix, pages 230 to 233. That is the letter that the collaborative wrote to the legislature with a summary of the issues after launch. And in that letter, among other things, the collaborative emphasized that Optum had paid over 50% of adjudicated claims and that it had paid the required 90-plus percent of clean claims within 30 days. It was meeting its contractual obligations. There was room for improvement, to be sure. There was a sanction that was issued, and just to be clear, United contested that. The settlement that came out of that dispute over whether there would be a sanction is found in the Joint Appendix at Volume 12, page 116. And I think when you look at those two documents, you can see that what happened here was certainly that there was implementation challenges. That is not uncommon when you're doing a massive new system. Think about healthcare.gov. Certainly there were failures when that system came online, but none of that is enough to indicate a subjectively held belief from a company whose job is to set up and run claims processing systems, and has done that for many states across the country, many localities across the country. And you have witnesses. You have the individual who was in charge of the proposal testifying about all of the work that went in from 50 people to putting together the proposal. You have testimony from the collaborative itself, the New Mexico entity that was involved in this, that it had reviewed the system multiple times before launch and raised no questions with its functionality. A few months in, the collaborative told the New Mexico legislature that Optum, quote, continues to meet all of its contractual requirements. The auditor at the time it was put into place gave Optum a compliance score of 84%, including a perfect score for claim reimbursement. The relator's own CEO testified that he thought that Optum's intentions in submitting the RFP response were, quote, probably honorable, and that he thought Optum intended to live up to its proposal. With all of these facts, and the district court's summary judgment ruling from pages 3 to 6 walks through the undisputed nature of these facts. In this context- Let me ask you a question about that last comment you made about probably honorable. What is your understanding of the law as it relates to CNTR? Are good intentions enough? In other words, if I really in my heart of hearts want to do X, but every objective fact in front of me says I can't do X, and I represent to you I will do X, I've still committed fraud, right? Because I've disregarded, recklessly disregarded, the objective state of the world. Judge Holmes, I was just about to say I think your hypothetical would fall into the third prong of the definition of knowingly in the statute, which is reckless disregard. And the way the Supreme Court described that was to say that you have consciousness of a substantial and unjustifiable risk that your claims or your statements are false, but you make them anyway. Well, that goes to- Well, that means that the CEO's statement about what their probable intent, they thought they were going to do a good job, that really doesn't tell us- that doesn't get us but so far, right? If on the objective facts on the ground were such that there was no objective basis for that intent. So, Your Honor, I think the 1,000 plus pages of this RFP readily undercut any suggestion that there was no objective basis for this. Optum had done this, United had done this in state after state, adjudicating and running claims processing systems and fraud detection systems for states ranging from Tennessee to Washington to San Diego County. And it spends hundreds of pages walking through all of that experience that it had in the undisputed facts. And it is important, this came up at summary judgment, the relator had an opportunity to dispute these facts about Optum and United's experience on this very topic, this very concept, this very issue, and they didn't choose to dispute any of them, which is why the district court was able to say in fact after fact in its opinion that this ruling was based on undisputed facts. You've heard in real time the response to the argument that was made that if count five goes on the knowingly component that it, in your adversary's view, does not preclude going forward on count one. And as I understood it, that was because there are differences as to facts, one relates to the federal government, one relates to the state, a variety of arguments that are made of that sort. What is your response now in real time to that argument? So, Your Honor, I would point you to footnote two of the relator's reply brief in which the relator told this court that counts one and five are, quote, predicated on the same facts, omissions, and actions by United. What are you reading? It's footnote two of the reply brief. It's on page nine of the reply brief. Are you saying the reply brief in the district court? No, the reply brief to this court.  I'm sorry. It's on page eight. Stand corrected on page eight. Appellant recognizes count five is predicated upon the same facts, omissions, and actions of United as alleged in count one. So I think that led Judge Carson, you to ask, well, what facts are you saying could be different now? And the only thing that the relator pointed you to were facts about the amendment that came at the end of the contract, to which Judge Carson, you responded by asking whether those go to fraudulent inducement. And I believe that relator's counsel said no, they really don't. The reality is that this is a situation where there was no daylight between the facts alleged for fraudulent inducement in count one and the facts alleged for fraudulent inducement in count five. I'm happy to answer any additional questions the court has on anything. Were there, how many other companies, if you know, responded to the RFP? I do not know the answer to that question. Do you know if there were any other ones? I don't know. I can get that information for you, but I don't know. It's extra record, obviously. I was just curious. I know that the RFP itself walks through the many months of time that was spent engaging with stakeholders, everyone from providers to the state to care providers in the state of New Mexico. And so there was a tremendous amount of effort that went into putting together that document to ensure that it did represent the views and there was an understanding from United about exactly what the situation was on the ground in New Mexico, to which it could apply its expertise and credentials from doing the same sort of programming in other states. Let me ask you a question about the reverse false claims contentions. Did New Mexico ever tell? Is it, in fact, the case that it's undisputed that New Mexico told United to suspend payment to the vendors that were being investigated? Yes, Your Honor. And did it tell United or Optum what to do with that money? To put those funds in escrow and then to pay them as the holds were lifted. The answer to that is yes, and you can see that at Volume 5 of the Joint Appendix from pages 205 to 207. You can also see it because HSD, the Human Services Department of New Mexico, told the district court this, that Optum was directed by HSD to withhold Medicaid payments pursuant to federal law. You can see HSD's statement to the federal court in Volume 1 of the Joint Appendix at page 96. Okay, I understand the withhold part, but it's your understanding, I take it, that at no point did the state say, give me the money back? That's right, Your Honor. Okay. If there are no further questions, we would ask that this court affirm the judgment below. Thank you, Your Honors. Thank you, Counsel. I appreciate the additional minute, and I just want to, if the court would indulge me in a quick analogy on the issue of Scienter. And I want to imagine an appliance salesman coming to your house and saying, I've got this great stove. It boils water in 30 seconds. It can heat to 1,000 degrees. It's got a proofing drawer for your sourdough. If you say, great, that's wonderful. Bring it in. I'll buy it. But then you realize after the salesman walks off that there are no cords in the back of a stove to attach it to electrical or gas. That is the type of situation that we're talking about here, where it's an inference from, as Chief Judge Holmes, you were saying earlier, an inference from an abject failure. And the abject failure is the lack of wires, that no technology existed at all to support their claims. And following your analogy or your metaphor, what are the lack of wires here? The lack of wires is any capacity to adjudicate claims in a timely manner and also setting up a fraud, waste, and abuse system. Thank you. Thank you, Counselor. I'm sorry. The case is submitted.